1

2

3

4

5

6 # UNITED STATES DISTRICT COURT

7 EASTERN DISTRICT OF CALIFORNIA

8

9 | DARRELL ARCHER, AND KEITHA | Case No. 1:12-CV-00261-LJO-JLT
10 | DARQUEA, |
11 | Plaintiffs, | MEMORANDUM DECISION AND ORDER
| | GRANTING IN PART AND DENYING IN
12 | v. | PART DEFENDANTS' MOTION FOR
| | SUMMARY JUDGMENT.
13 | JILL GIPSON; JOSEPH BURKE; AND, |
| J.E. BURKE CONSTRUCTION, INC., |
14 | | (Doc. 72)
| Defendants. |
15

16

17        Before the Court in the above-styled and numbered cause of action is Defendant Jill Gipson,

18 Joseph Burke, and J.E. Burke Construction, Inc.'s (collectively, "Defendants") Motion for Summary

19 Judgment, filed March 3, 2015. (Doc. 72).  Plaintiffs Darrell Archer and Keitha Darquea filed their

20 Opposition on March 30, 2015 (Doc. 74), and Defendants filed objections (Docs. 79 & 80) on April

21 10, 2015.  The matters are appropriate for resolution without oral argument. *See* Local Rule 230(g).

22 Having considered the record in this case, the parties' briefing, and the relevant law, the Court will

23 grant in part and deny in part Defendants' motion.

24 ## BACKGROUND

25 ## I.  FACTUAL BACKGROUND

26        The following relevant facts come primarily from Plaintiffs' First Amended Complaint

27 ("FAC") (Doc. 4); Archer's declaration ("Arch. Decl.") (Doc. 76): Darquea's declaration ("Darq.

28 Decl.") (Doc. 77); Defendants' Separate Statement of Undisputed Material Facts ("SSUMF") (Doc.

72-2); Defendant Gipson's deposition ("Gip. Depo.") and declaration ("Gip. Decl.") (Doc. 72-3), as well as the Photographic Evidence ("Photo. Evid.") (Docs. 72-6, 72-7, 72-15, 72-16, 72-24).

### A. The Parties

Plaintiffs Keitha Darquea ("Darquea") and Darrell Archer ("Archer") (together, "Plaintiffs") reside at 2408 Bladen Street in Bakersfield, California ("the Bakersfield address"). FAC ¶ 20. Darquea owns real property (APN 031-290-015) in the City of Taft ("the City"), in Kern County ("the County"), California, located at 300 Lucard Street as well as 509 3rd Street (collectively, "the Property"). FAC p. 3:17-18, ¶ 6, 20; SSUMF 66, 92.  Darquea and Archer were married on December 18, 2006. SSUMF ¶ 61.  Archer claims that he first became an owner of the Property when he and Darquea married. SSUMF ¶ 89.  Plaintiffs have, between themselves, signed a document titled "Postnuptial Property Agreement" (Darq. Decl., Doc. 77, Ex. 2), related to community property ownership of the Property, although no papers have been filed with the County to record ownership of the Property in Archer's name. SSUMF ¶ 91.

Plaintiffs bring the instant actions against Defendants Jill Gipson, the Code Enforcement Officer for the City ("Gipson" or "Code Enforcement Officer"), in her official and individual capacity, and Joseph Burke, a principal at J.E. Burke Construction, Inc. ("Burke"), in his individual capacity, as well as J.E. Burke Construction, Inc. (together, "the Burke Defendants") (collectively, "Defendants"). *See generally* FAC, and ¶¶ 40, 76.  Defendant J.E. Burke Construction, Inc. is a California corporation and a local contractor hired by the City. FAC ¶ 75.

Defendant Gipson is and was the sole Code Enforcement Officer for the City. FAC ¶ 8; SSUMF ¶ 1.  The Code Enforcement Officer enforces portions of the Taft Municipal Code (herein "TMC"). FAC ¶ 9; SSUMF ¶ 2.  The Code Enforcement Officer enforces code sections pertaining to the abatement of public nuisances within the City's limits, which can include searching properties and seizing personal property. FAC ¶ 9; SSUMF ¶ 3.  The City defines "nuisance" the same as in California Civil Code. SSUMF ¶ 4.  The Burke Defendants, together with Gipson, went to the Property and seized their personal property. FAC ¶¶ 75, 77.  Burke proceeded at the direction and guidance of Gipson, and Defendants seized the personal property without a warrant. FAC ¶ 78.

//

**B.  Plaintiffs' Real Property**

The Property at issue, together 300 Lucard Street and the adjacent 509 3rd Street, is a large corner lot on the corner of Lucard and Third streets, containing three buildings: a three-apartment building, a two-story cottage, a two-car garage, as well as land between the structures. FAC ¶ 21; SSUMF ¶ 93.  Of these, the cottage and garage are located at 509 3rd Street. SSUMF ¶ 67.  The back yard of 300 Lucard Street serves also as the front yard of the 3rd Street cottage. *See* Photo. Evid. (Docs. 72-6, 72-7, 72-15, 72-16, 72-24).  As of the time of the abatement on September 24, 2010, there was no wall or fence separating the yards shared by the Lucard and 3rd Street properties. *Id.*; SSUMF ¶ 76.  A wire fence ran along the sidewalk next to 509 3rd Street. *Id.;* SSUMF ¶ 75.

Darquea purchased 300 Lucard Street and 509 3rd Street at the same time. SSUMF ¶ 69. Darquea believes that 300 Lucard and 509 3rd Street are on the same lot. SSUMF ¶ 68.  The Grant Deed executed on September 6, 1974, pertains to the property at 300 Lucard Street. SSUMF ¶ 101.

Because Plaintiffs reside in Bakersfield and the Property is in Taft, the Plaintiffs use a property manager and sometimes do not go to the Property for a few months at a time. FAC ¶ 22. Construction had been and/or was ongoing at the Property, including for instance, new roofs, fence, and foundation. FAC ¶ 25.

**C.  Plaintiffs' Personal Property**

Plaintiffs were saving construction materials at the Property to use when they would return to continue the construction work. FAC ¶ 23.  Plaintiffs kept stored a stack of materials, including mostly old dimension redwood, at the Property, as well as some metal sheeting, some smaller pieces of old dimension lumber, and also a large planter made of decorative lava-type rocks (which had formerly and for many years, since the 1960s, contained a large cactus) (collectively, "the Construction Materials"). FAC ¶ 24.

The Construction Materials were in the yard at 300 Lucard Street, on private property, behind a wire fence. FAC ¶ 25.  The pile of construction materials in the yard was not neatly stacked. FAC ¶ 32.  Plaintiffs put the value of the construction materials and rocks at approximately $6,000. FAC ¶ 30.  The pile of materials existed in the described condition at the Property for about a year before it was removed by the City. SSUMF ¶ 95.  The last time that Darquea had visited the

Property there was a pile of materials there. SSUMF ¶ 72.  A photograph taken by Gipson (Doc. 72-6) accurately depicts what the pile of materials looked like at the Property when Darquea last visited it, before the abatement on September 24, 2010, and the wire fence could have been laying down as shown in the photograph. SSUMF ¶¶ 73, 74.

### D.  Historical Background

Plaintiff Darquea's mother is Mary Meredith ("Meredith"). SSUMF ¶ 84.  Meredith owned 509 3rd Street until she died. SSUMF ¶ 94.  Meredith died in 2004. SSUMF ¶ 77.  Darquea filed nothing with the County Recorder to put the County on notice that Mary Meredith had passed away. SSUMF ¶ 81.  Meredith, Mary Lee Meredith, "Mary Lee Irrev Meredith," and "Mary Lee Meredith Irrev" all refer to the same person. SSUMF ¶ 96.  The County Assessor designated Parcel Number 031-290-15-00 with the address 300 Lucard Street and its owner as "Meredith Mary Lee Irrev TR." SSUMF  ¶¶ 23, 24.

The County Assessor lists the mailing address for Parcel Number 031-290-15-00 as the Bakersfield address. SSUMF ¶ 25.  Darquea has lived at the Bakersfield address for 36 years. SSUMF ¶ 64.  During that time, Darquea received mail at the Bakersfield address. SSUMF ¶ 65. After her mother's death, Darquea continued to receive mail addressed to her at the Bakersfield address. SSUMF ¶ 78.  As of June 15, 2010, the Bakersfield address was also Darquea's mother's mailing address. SSUMF ¶ 85.  From the time Darquea first took ownership of 300 Lucard Street in 1974, after Meredith's death up until the present, the tax bills for the Property have always been sent by Kern County in the name of Mary Meredith to the Bakersfield address. SSUMF ¶¶ 79, 80, 82.  Mail addressed to "Mary Lee Meredith Irrev" or "Mary Lee Meredith" or "Mary Lee Irrev Meredith" at the Bakersfield address would have been delivered there in 2010 and 2011. SSUMF ¶ 99.  In 2010, Darquea received tax bills from the County of Kern addressed to Meredith at the Bakersfield address regarding the property located at 300 Lucard Street. SSUMF ¶ 86.

The envelope from the City with the Notice of Violation was addressed to "Mary Lee Meredith" at the Bakersfield address, the same address where tax bills were sent from the County. SSUMF ¶ 87.

//

**E.  Nuisance Abatement: Investigative Actions, Searches, and Seizure**

**1.  The First Search – June  8, 2010**

On June 8, 2010, Gipson saw a wire fence that she saw was knocked down in the front yard of a private dwelling at 509 3rd Street. SSUMF ¶ 5.  Gipson investigated from the street by looking through the fence ("the First Search"), and she observed a pile of items that she considered junk, trash, and debris in plain view in the front yard of the private dwelling. SSUMF ¶ 6.  The pile of items included used wood, used bricks, used sheet metal, used wire, and rocks. SSUMF ¶ 7; Doc. 72-6.  The pile in the front yard at 509 3rd Street was in plain view to Gipson from where she sat in her vehicle on 3rd Street. SSUMF ¶ 11.  Nothing prevented an individual driving by the Property from seeing the pile of materials through the wire fence. SSUMF ¶ 83.  Gipson noticed that an elementary school was located directly across the street from 509 3rd Street. SSUMF ¶ 10, Doc. 72-7.[1]  Gipson concluded that the knocked down fence made it easy for children to gain access to the pile of items in the front yard at the Property. SSUMF ¶ 9.  Defendants state that Gipson saw a child of elementary school age playing on the pile of debris in the front yard at 509 3rd Street. SSUMF ¶ 8; Doc. 72-1, at 20:24-25.  At her deposition, when asked if she was speculating about such an event, Gipson said, "Yes."[2] Gip. Decl. p. 62, 18-25.  At that time, Gipson admitted that her concern about children playing on the construction materials was merely speculative. *See* Gip. Decl. p. 62, 18-25.  Specifically, when asked if there was anything on the Property which threatened public health, Gipson stated:

> There's a small school across the street and I didn't want kids to get up and play in all that stuff and get hurt because the kids walk back and forth in front of the property daily. I know kids are mischievous. I don't know if they would get into that and play or not.

*Id.* During the First Search, Gipson concluded that the pile of items in front of 509 3rd Street was a safety hazard and constituted a public nuisance. SSUMF ¶¶ 12, 13.  On that basis, Gipson concluded that the pile of items in front of 509 3rd Street was in violation of TMC, Sections 3-4-8(A)3(a) and 3-4-8(A)3(c). SSUMF ¶¶ 14, 15.

---

[1] A photograph depicting the property at 509 3rd Street (foreground) and the elementary school across the street (background); an aerial photograph from Google Maps depicts the relative locations of the two properties and the elementary school.

[2] This is the first of at least two inconsistencies within Defendants' statement of facts.

In summary, Defendants assert that the grounds for Gipson's conclusion were the following: (a) The pile of debris was composed of used wood, used bricks, used sheet metal, used wire, and rocks (SSUMF ¶ 16); (b) the fence was partially knocked down, thereby giving children easy access into the yard of that dwelling (SSUMF ¶ 17); (c) the Property's close proximity to an elementary school (SSUMF ¶¶ 18, 20);  (d) and, that an elementary-aged child with access to the Property played on the pile of debris, which posed a real threat or danger for serious injury (SSUMF ¶ 19).

Continuing her investigation, Gipson researched records from the Kern County Assessor to learn that 509 3rd Street is on a lot identified as Parcel Number 031-290-15-00 (aka ATN 031-290-15-00-5) ("the Parcel"). SSUMF ¶ 22; Ex. D.[3]  On June 15, 2010, Gipson initiated the nuisance abatement process pursuant to the TMC with regard to the Parcel. SSUMF ¶ 26.

### 2.  The Undelivered First Notice of Violation – June 2010

On June 15, 2010, Gipson issued a "Notice Of Violation – 15 Day Notice And Order To Abate," ("the Notice") to the listed owner of Parcel Number 031-290-15-00, "Mary Lee Irrev TR Meredith." SSUMF ¶ 27.  The Notice, dated June 15, 2010, advised Meredith that Parcel Number 031-290-15-00 had "junk, trash, and debris" in violation of TMC, Sections 3-4-8(A)3(a) and 3-4-8(A)3(c), and directed the owner to abate the nuisance at that parcel within 15 days. SSUMF ¶¶ 28, 29.  Attached to the Notice was a letter from the Code Enforcement Division ("the CED Letter") explaining the City's abatement process. SSUMF ¶ 30.  The CED Letter advised the property owner that they "may request an appeal with the City Council" within a specified time. SSUMF ¶ 31; Docs. 72-11, 12.

On June 16, 2010, Gipson sent the Notice of Violation and the CED Letter addressed to the listed property owner, Meredith, via certified mail (Receipt Number 7007 2560 0000 8475 1938), at her listed address of record, the Bakersfield address. SSUMF ¶¶ 32, 33; Docs. 72-7, 13; FAC ¶¶ 26, 89.  Certified mail must be signed for at the post office. FAC ¶ 26.

The U.S. Postal Service attempted delivery, but was unsuccessful.  SSUMF ¶ 34; FAC ¶¶ 29, 91.  On June 17, 2010, the U.S. Postal Service provided the City with a notice (Receipt Number

---

[3] A certified copy of the Assessors Map depicting Lot 15, Parcel Number 031-290-15-00 aka ATN 031- 290-15-00-5 is docketed as Doc. 72-9.

6

7007 2560 0000 8475 1938) regarding its unsuccessful attempt to deliver the certified mail to Meredith at the Bakersfield Address. SSUMF ¶ 34.  On or about July 12, 2010, the U.S. Postal Service returned undelivered the envelope containing the violation documents that had been sent to Meredith by the City. SSUMF ¶ 35.  Plaintiffs never received the Notice about such a mailing nor did they receive the CED Letter. *Id.*; FAC ¶¶ 27, 90.  Although Plaintiffs did not receive the certified mail, they later obtained the Notice of Violation via a public records request. FAC ¶ 28.

Plaintiffs allege that on or about June 15 or 17, 2010, Gipson, the City's Code Enforcement Officer, came onto their Property for the purpose of posting a Notice of Code Violation. FAC ¶ 26.  And, at that time, the City posted the Notice of Code Violation on Plaintiffs' property at 300 Lucard Street. FAC ¶ 89.

### 3.  The Second Search: August 2010

On August 11, 2010, Gipson returned to the Property, investigated ("the Second Search"), and observed that the public nuisance had not been removed. SSUMF ¶ 37.  Because of Gipson's extended absence from work due to illness, some time had passed after she began the abatement process in June 2010, and continued it with the Second Search in early to mid-August 2010. SSUMF ¶ 36.

During the Second Search, Gipson observed that the pile of debris was still in the identical condition and location in front of the dwelling as it had been when she first observed it two months prior, in June 2010. SSUMF ¶¶ 38, 40.  She also observed that the pile of materials was still composed of the same used wood, used bricks, used sheet metal, used wire, and rocks. SSUMF 39.  A portion of the wire fence was still knocked down at the premises.[4] SSUMF ¶¶ 41, 50.  Gipson took photographs of the pile of Construction Materials as they appeared on August 11, 2010. *See* Docs. 72-6 through 24.   At that time, Gipson concluded that the pile of debris continued to pose an

---

[4] The Court notes inconsistencies in Defendants' factual allegations.  There is a material difference between a fence entirely knocked down, and a fence with a downed segment.  In addition to the first noted inconsistency in Defendants' presentation of the facts (whether Gipson observed a child playing on the materials, or merely *speculated* that one might), in paragraph 41 of their Separate Statement of Undisputed Material Facts, Defendants state that "[t]he wire fence was still knocked down."  But in paragraph 50 of the same statement Defendants state that "[a] *portion* of the wire fence was still knocked down."  Counsel is cautioned to be precise in their presentation of the facts.

immediate threat of injury or danger to neighboring children. SSUMF ¶ 42.  During the Second Search, it was Gipson's intention to inform the occupant of her observations about the materials that required immediate cleanup, however, the dwelling was apparently vacant and she did not speak to anyone. SSUMF ¶ 43.

Also on August, 11, 2010, Gipson entered the Property and posted the Notice of Violation and the CED Letter on the wall outside 509 3rd Street (Parcel Number 031-290-15-00). SSUMF ¶ 44; Doc. 72-15.

### 4.   The September 2010 Abatement: Search, Culminating in a Seizure

Gipson neither sought nor received a warrant relevant to the abatement actions. FAC ¶ 94; SSUMF  ¶¶ 47, 48; *see* Defs. Mtn. for Summary Judgment (Doc. 72-1) ("Defendants acknowledge that no consent or warrant was obtained before performing the abatement.").

In August 2010, Gipson issued a Bid Request for an independent contractor to abate/cleanup the public nuisance at the Property, to remove the pile of materials from Plaintiffs' Property. SSUMF ¶ 45.  In September 2010, Gipson, as the City's Code Enforcement Division, hired Joseph Burke and his company, J.E. Burke Construction, Inc., to perform the nuisance abatement and clean-up at 509 3rd Street/300 Lucard Street, Parcel Number 031-290-15-00 (aka ATN 031-290-15-00-5), pursuant to TMC, Section 3-4-11(B)(4). SSUMF ¶ 46, 100; FAC ¶ 30.

On September 24, 2010, immediately before the cleanup, Gipson investigated at the Property and observed that the pile of items was still in nearly the identical condition as when she first declared the condition a public nuisance on June 8, 2010. SSUMF ¶ 49.  The photographs taken during the previous search in August 2010 accurately depict the condition of the subject pile of materials and wire fence as they also appeared on September 24, 2010. SSUMF ¶ 51; Doc. 72-6.

On September 24, 2010, the Defendants together went onto Plaintiffs' property for the purpose of removing from the Property Plaintiffs' Construction Materials. FAC ¶ 30.  On that date, Gipson accompanied the Burke Defendants to the Property, where the Burke Defendants, under Gipson's direction and authority, removed the Construction Materials and cleaned up outside at 509 3rd Street/300 Lucard Street, Parcel Number 031-290-15-00, and did so without a warrant. SSUMF ¶ 47, 48; FAC ¶ 31).

On September 28, 2010, Gipson returned to the property at 509 3rd Street (Parcel Number 031-290-15-00) and confirmed that the clean-up had been completed and that the wire fence had been repaired. SSUMF ¶ 52; Doc. 72-16.

### 5. The Lien

The Burke Defendants invoiced the City for $892.00 related to the work done at the Property, and the City paid that sum to the Burke Defendants. SSUMF ¶ 53; Doc. 72-17.  The City charged Plaintiffs the cost of nuisance abatement performed by the contractor, and billed them also for the Code Enforcement Officer's time; the total was $937.36. SSUMF ¶ 55; FAC ¶ 85.  Plaintiffs have not paid any sums toward the costs that the City claims to have incurred for the Property clean-up. FAC ¶ 15; SSUMF ¶ 98.  On October 11, 2010, the City caused a Declaration of Substandard Property, signed by Gipson, to be filed with the Kern County Assessor regarding Parcel Number 031-290-15-00. SSUMF ¶ 54; Doc. 72-18; FAC ¶ 33.

On February 23, 2011, the City sent a letter to Meredith, the listed owner, to advise her of a Public Hearing by the Taft City Council ("the City Council") on March 15, 2011, regarding the possible placement of a lien on Parcel Number 031-290-15-00 in the amount of $937.36 ("the Lien Notice"), in connection with the abatement. SSUMF ¶ 55; Doc. 72-19.

Soon after February 23, 2011, Plaintiffs became aware of the City's abatement actions when they received the Lien Notice from the City addressed to Meredith, by certified mail, at the Bakersfield Address. SSUMF ¶ 97; FAC ¶ 34.  The Lien Notice gave information about the City's intention to file a lien on the property related to violations of TMC Title III Chapter 4 and 5 for the costs of abatement, and about the upcoming March 15, 2011 City Council meeting where Plaintiffs could appear to voice their objections. SSUMF ¶ 97; Doc. 72-19; FAC ¶¶ 12, 34.  Although the Lien Letter mentioned that other invoices had previously been sent to their address, there is no evidence that Plaintiffs received any such invoices or had received any other prior correspondence from the City. FAC ¶¶ 34, 35.

Upon receipt of the Lien Notice, Plaintiff Archer contacted Gipson by telephone, and she described to him her authority granted by the Taft Municipal Code. FAC ¶ 36.  In response, he expressed his disbelief and plans to object and contest the matter. FAC ¶ 36.  During that or another

phone conversation, sometime before the City Council meeting, Gipson explained to Archer that she did not need a warrant to seize property. FAC ¶ 17.

On March 15, 2011, the Taft City Council held a public hearing on costs and placement of liens on the abated properties located at 509 3rd Street/300 Lucard Street (Parcel Number 031-290-15-00). SSUMF ¶ 56; FAC ¶ 15.  Plaintiffs Archer and Darquea attended the meeting. SSUMF ¶ 57; FAC ¶ 15.  Archer spoke at the meeting and conveyed his opposition to the placement of a lien on the subject parcel. SSUMF ¶ 58; FAC ¶ 37.  Plaintiffs were unwilling to pay the $937.36 assessed for the nuisance abatement. FAC ¶ 15.  Plaintiffs voiced their concern about the City's actions and interacted with the mayor, council members, the city clerk, the city attorney, noting that each acted with an attitude of indifference. FAC ¶ 37.  After Archer accused the City of "exerting acts of ownership over private property," the then-mayor told Archer to "sit down." *Id*.  Gipson also testified at the meeting, described the public nuisance at the Property, and offered her opinion and justifications for her actions. SSUMF ¶ 59; FAC ¶ 69.  The City Council passed Resolution No. 3274-11, approving and confirming the costs of the abatement at the properties located at 509 3rd Street/300 Lucard Street (Parcel Number 031-290-15-00 aka ATN 031-290-15-00-5), in the total amount of $937.36, as a lien on the subject property. SSUMF ¶ 60; Docs. 72-20, 21.  The City did not offer to compensate Plaintiffs for taking their personal property, but instead still seeks to collect $937.36 from Plaintiffs. FAC ¶ 38.  On May 7, 2011, the City submitted a lien on Plaintiffs' property to the Kern County Recorder's office, and it was subsequently recorded. FAC ¶ 105.

## II.     PROCEDURAL BACKGROUND

Plaintiffs commenced this action on February 23, 2012, after the City declared a public nuisance on their property and executed an abatement action by removing the Construction Materials from the Property. *See* Complaint ("Compl.," Doc. 1).  Plaintiffs' claims arise under 42 U.S.C. § 1983 ("Section 1983"), alleging violations of their Fourth, Fifth, and Fourteenth Amendment rights stemming from Defendants' search of their real property and Defendants' seizure of Plaintiffs' personal property from that location. *See* Compl.  The Court screened Plaintiffs' Complaint, and dismissed it with leave to amend. Doc. 3. Pursuant to the Court's order, Plaintiffs filed their First Amended Complaint on May 15, 2012. (Doc. 4).  The Court screened the

amended pleading, and instructed Plaintiffs to file a second amended complaint, or notify the Court of their willingness to proceed only on claims found to be cognizable. (Doc. 5).

On August 17, 2012, Plaintiffs filed a notice of their intention to proceed only on cognizable claims. (Doc. 6).  Accordingly, on August 22, 2012, the Magistrate Judge recommended the action proceed against Defendants Jill Gipson, Joseph Burke, J.E. Burke Construction, Inc., and that the remaining defendants be dismissed. (Doc. 7).  The Magistrate Judge determined Plaintiffs' causes of action against the remaining defendants either lacked factual support of failed as a matter of law. (*Id.*, at 15).  Plaintiffs did not file objections to the Magistrate Judge's Findings and Recommendations.  After conducting a *de novo* review of the case, this Court adopted in full the Magistrate Judge's Findings and Recommendations on September 11, 2012. (Doc. 12).  The case thus proceeds on the following claims: (1) Violation of the Fourth Amendment by defendants Jill Gipson, Joseph Burke, and J.E. Burke Construction Inc.; and, (2) Violation of the Fourteenth Amendment by defendants Jill Gipson, Joseph Burke, and J.E. Burke Construction Inc.

On September 12, 2012, without leave from the Court, Plaintiffs filed a Second Amended Complaint ("SAC," Doc. 13).  As Plaintiffs had previously elected to proceed only on the cognizable claims and only as to the remaining defendants (Doc. 6), the Magistrate Judge ordered the SAC stricken, and deemed the answer filed to be in response to the FAC. (Doc. 31).  On January 30, 2014, Defendants filed requests for an entry of default (Docs. 19 & 20).  The Clerk of Court entered defaults on January 31, 2014 (Docs. 21 & 22).  On June 5, 2014, pursuant to the parties' stipulation (Doc. 40), the Magistrate Judge set aside the entry of default. (Docs. 21, 22, 41).  On June 30, 2014, Defendants filed their Answer (Doc. 55), and again asked the Court for entry of default (Doc. 56), which the Magistrate Judge declined. (Doc. 58).

On March 3, 2015, Defendants timely filed their Motion for Summary Judgment. (Doc. 72).  Plaintiffs filed their Opposition on March 30, 2015 (Doc. 74), to which Defendants filed their Objections[5] on April 10, 2015 (Docs. 79 & 80).  The matter is now ripe for review.

---

[5] The parties interpose several objections to evidence presented, both within the various statements of fact and in stand-alone objection memoranda. (Docs. 79 & 80).  The Court need not address these because in ruling on the instant motion it does not consider the materials to which defendants object. *See Norse v. City of Santa Cruz,* 629 F.3d 966, 973 (9th Cir. 2010).

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Id.*, at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex,* 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.*, at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record as a whole could not lead a rational trier of fact to

12

find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Liberty Lobby,* 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. Fed.R.Civ.P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun,* 509 F.3d at 984.

As Plaintiffs proceed *pro se*, the Court acknowledges that it should "treat the opposing party's papers more indulgently that the moving party's papers." *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985); *see also Scharf v. U.S. Atty. Gen.,* 597 F.2d 1240, 1243 (9th Cir. 1979) (finding that courts may be "much more lenient" with the affidavits and documents of the party opposing summary judgment). "A verified complaint may be treated as an affidavit to oppose summary judgment to the extent it is 'based on personal knowledge' and 'sets forth specific facts admissible in evidence.'" *Keenan v. Hall*, 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996) (quoting *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n. 1 (9th Cir. 1987) (per curiam)), *amended by* 135 F.3d 1318 (9th Cir. 1998); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc); *Schroeder v. MacDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *Lew*, 754 F.2d at 1423. If a plaintiff states that the facts in the complaint are true under penalty of perjury, as Plaintiffs do in this case, the pleading is "verified." *Schroeder*, 55 F.3d at 460 n. 10. In a *pro se* civil rights action, a verified complaint may constitute an opposing affidavit so long as the allegations are based on a plaintiff's personal knowledge of admissible evidence, and not merely on belief. *See McElyea*, 833 F.2d at 197-98.

### DISCUSSION

Plaintiffs assert that by searching their residential property and subsequently seizing their personal property, Defendants violated their Fourth Amendment rights and subsequently deprived them of due process under the Fourteenth Amendment.

13

Defendants contend that they lawfully searched the yard at the Property, lawfully seized the Construction Materials under exigent circumstances, and that Plaintiffs were afforded due process.

## I.    STANDING

As a threshold issue, the Defendants argue that Plaintiff Archer, Darquea's husband, lacks standing to bring this action because he is not the property owner of record and he has no community property interest to confer standing.

Standing is an aspect of subject matter jurisdiction. *Fleck & Assoc., Inc. v. City of Phoenix,* 471 F.3d 1100, 1106 n. 4 (9th Cir. 2006).  To evaluate standing, the inquiry is "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright,* 468 U.S. 737, 750-751 (1984).

The Court, however, need not reach whether Archer's alleged community property interests are sufficient to confer standing, as he contends, because Darquea unquestionably has standing. *See Bachelder v. Am. West Airlines, Inc.,* 259 F.3d 1112, 1118 n. 1 (9th Cir. 2001) (holding that the question of a husband's standing to sue on the basis of his community property interest was irrelevant where his wife "unquestionably has standing to sue, and [his] presence as a plaintiff has no effect on the relief available"); *see also Murphy v. Bilbray,* 782 F. Supp. 1420, 1426 n. 19 (S.D. Cal. 1991) (holding that where at least one plaintiff in each of three consolidated cases had standing, the court was required to reach of the merits of each case and did not need to address whether a co-plaintiff in one case had standing).

Because Plaintiff Darquea's standing is not in dispute and the potential relief in the case is unaffected by Archer's status, the Court proceeds to the merits.

## II.    SECTION 1983 CLAIMS

To succeed on their Section 1983 claims, Plaintiffs must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy,* 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924 (1982).

As the moving party, Defendants bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case." *Celotex,* 477 U.S. at 325.  Here, the

parties do not dispute whether Defendants acted under color of state law, but whether by their

actions Defendants violated Plaintiffs' constitutional rights.

## A.  FOURTH AMENDMENT CLAIMS

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  "The Fourth

Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991) (citations omitted).

The Court proceeds first to evaluate the reasonableness of the searches at the Property, then

turns to the reasonableness of the subsequent seizure of Plaintiffs' personal property.

### 1.  First Cause of Action: Unreasonable Search

Plaintiffs allege that by searching the yard at their Property without a warrant, Defendants

violated their Fourth Amendment rights.  Defendants counter that the search was constitutional

because the area was plainly observable to the public from the street.

Defendants concede that Gipson searched the yard at the Property without a warrant, but

argue that even if the stored Construction Materials were within the curtilage of the Property, as

Plaintiffs argue, the items were unprotected from outside observation.[6]  It is well-settled that if

items within the curtilage are "readily visible," a warrant to search such an area is not required

because "officers [need not] shield their eyes when passing by a home on public thoroughfares."

*United States v. Perea-Rey*, 680 F.3d 1179, 1186 (9th Cir. 2012) (citing *California v. Ciraolo*, 476

U.S. 207, 213 (1986)).

Such are the conditions here.  Evidence in the record illustrates that Defendants searched the

yard at Plaintiffs' property in a residential neighborhood, and Plaintiffs made no effort to shield the

Construction Materials from view as they were stored within the yard behind a wire fence.  Because

from the street Gipson could plainly see the materials through the wire fence, a warrant for the

---

[6] This analysis is aided by the photographs of the Property.  The parties do not dispute that these photographs accurately depict the Property's yard, including the Construction Materials that lay within its boundaries.

search was not required. *Id.*, at 1186.  Accordingly, the Court concludes that Gipson's search was reasonable.  As no genuine issues of material fact remain for trial, the Court will grant summary judgment on this cause of action in favor of Defendants.

### 2.   Second Cause of Action: Unreasonable Seizure

Whether or not the materials could be seen from the street, the Fourth Amendment's warrant requirement applies to entries onto private property to abate known nuisances. *Conner v. City of Santa Ana*, 897 F.2d 1487, 1490 (9th Cir. 1990).  On that basis, Plaintiffs assert that the Defendants' subsequent warrantless entry on their private property for the purpose of seizing their personal property was unreasonable and violative of their Fourth Amendment rights.

"It is clear that the warrant requirement of the fourth amendment applies to entries onto private land to search for and abate suspected nuisances." *Id.*, at 1490 (footnote omitted) (citing *Michigan v. Tyler,* 436 U.S. 499, 504-07 (1978); *Camara v. Municipal Court,* 387 U.S. 523, 530 (1967)); *see also Schneider v. County of San Diego,* 28 F.3d 89, 91 (9th Cir. 1994).  It is also clear that removing personal property is a seizure within the meaning of the Fourth Amendment. *See e.g. Miranda v. City of Cornelius,* 429 F.3d 858, 862 (9th Cir. 2005).

Defendants concede that they entered the Property and seized the Construction Materials without a warrant or consent, but make two arguments in support of their contention that the warrantless trespass and seizure did not violate Fourth Amendment principles. First, they aver that the seizure was lawful because Plaintiffs had no reasonable expectation of privacy in the area from which the government seized the materials in plain view.  Second, Defendants argue that even if the area does fall within the umbrella of Fourth Amendment protections, conditions at the Property "posed an immediate threat or danger to the health of neighboring children," and this qualifies as an emergency exception to the warrant requirement. *See* Doc. 72-1.

//
//
//
//
//

16

1

*a.   Reasonable Expectation of Privacy*

2

Defendants argue that because the Construction Materials were in plain view and the fence

3

was partially knocked down, Plaintiffs had no reasonable expectation of privacy in the area

4

searched and from which the City seized such materials.[7]

5

Defendants conflate seizures with searches.  Where, like here, the City posits that Plaintiffs'

6

claims necessarily fail absent a showing of a reasonable expectation of privacy, the City

7

"misapprehends the appropriate Fourth Amendment inquiry, as well as the fundamental nature of

8

the interests it protects." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012).  In this

9

analysis, "[t]he reasonableness of [an individual's] expectation of privacy is irrelevant as to the

10

question before us: whether the Fourth Amendment protects [their] unabandoned property from

11

unreasonable <u>seizures</u>. *Id.* (emphasis added).  Contrary to Defendants' interpretation, the Fourth

12

Amendment protects both types of expectations. *Id.*

13

Certainly whether a search is unconstitutional hinges on whether it pierces an individual's

14

reasonable expectation of privacy. *See, e.g.*, *id.* ("A 'search' occurs when the government intrudes

15

upon an expectation of privacy that society is prepared to consider reasonable.") (citing *United*

16

*States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

17

But the same cannot be said about seizures.  The Supreme Court has made absolutely clear

18

that the Fourth Amendment "protects possessory and liberty interests . . . even when privacy rights

19

are not implicated." *Soldal v. Cook County,* 506 U.S. 56, 63-64 & n. 8 (1992); *see e.g. United*

20

*States v. Jones*, 132 S.Ct. 945, 950-51 (2012) (finding that a reasonable expectation of privacy is

21

not required to trigger Fourth Amendment protections).  If searches are perception, seizures are

22

reception.  A seizure "occurs when there is some meaningful interference with an individual's

23

possessory interests in that property." *Lavan*, 693 F.3d at 1027 (citing *Jacobsen,* 466 U.S. at 113).

24

[7] Even should the Court consider privacy interests in the context of a warrantless seizure, it is

25

"easily understood from our daily experience" that such a residential yard is curtilage. *Oliver v. United States*, 466 U.S. 170, 182 n. 12 (1984); *see also United States v. Struckman*, 603 F.3d 731,

26

739 (9th Cir. 2010) (applying *Dunn* factors and finding that "a small, enclosed yard adjacent to a home in a residential neighborhood [ ] is unquestionably such a 'clearly marked' area 'to which the

27

activity of home life extends,' and so is 'curtilage' subject to the Fourth Amendment protection.") (quoting *Oliver,* 466 U.S. at 182 n. 12); *see also Perea-Rey*, 680 F.3d at 1188 n. 5 (finding that

28

individuals had a justified expectation of privacy in a "private yard or carport").

In *Jones*, the Supreme Court specifically rejected the government's argument that the Fourth Amendment is not implicated because Jones had no reasonable expectation of privacy in an area "visible to all." 132 S.Ct. at 950.  Indeed, the Court emphasized that it "need not address the Government's contentions, because Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation [the reasonable expectation of privacy test]." *Id.*, at 950.  The Court noted that *Katz* augmented, rather than limited, Fourth Amendment protections. *Id.*, at 951.

In the wake of *Jones*, the Ninth Circuit, in *Lavan*, analyzed the constitutionality of a city's warrantless seizure of homeless individuals' personal property from a public sidewalk. 693 F.3d 1022.  Citing *Jones*, the Court concluded that:

> [Individuals] need not show a reasonable expectation of privacy to enjoy the protection of the Fourth Amendment against *seizures* of their unabandoned property. Although the district court determined that [the individuals] had a reasonable expectation of privacy in their [personal property], we need not decide that question because the constitutional standard is whether there was "some meaningful interference" with Plaintiffs' possessory interest in the property.

*Id.*, at 1027-28 (emphasis in the original).

Likewise here, the analysis turns not on privacy rights, but instead on whether there was "some meaningful interference" with Plaintiffs' possessory interest in their personal property. There was.  It is undisputed that Defendants seized and disposed of Plaintiffs' Construction Materials and Defendants did not have a warrant to do so.  On that basis, the Court concludes that the seizure was *per se* unreasonable.  Therefore, the proper inquiry is whether there exists an applicable exception to the warrant requirement. *See id.*, at 1027.

### b.  Exceptions to the Warrant Requirement

Defendants acknowledge that it is well-settled[8] that a search or seizure carried out on private property without a warrant is *per se* unreasonable unless it falls within one of a "carefully defined"

---

[8] "[A]bsent exigent circumstances, 'officials engaged in the abatement of a public nuisance must have a warrant' to enter a backyard; 'it is the prospective invasion of constitutionally protected interests by an entry onto property and not the purpose of the entry which calls forth the warrant requirement.'" *Conner*, 897 F.2d at 1490-91; *see Schneider*, 28 F.3d at 91 ("'[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant.'"); *see also Miranda*, 429 F.3d at 862 ("'A seizure

set of exceptions based on the presence of "exigent circumstances." Doc. 72-1, at 19:13-16 (citing *United States v. Device More or Less Labeled Theramatic*, 641 F.2d 1289, 1291 (9th Cir. 1981)). Defendants contend that, because conditions at the Property were so dire, they fall within the emergency exception to the warrant requirement.  Defendants assert that during Gipson's first visit to the Property on June 8, 2010, she observed a child at the Property, playing on the pile of Construction Materials in the yard, and for that reason and due to the Property's proximity to the elementary school and the nature of children, Defendants state that Gipson concluded that conditions at the Property posed an immediate threat of injury or danger. SSUMF ¶¶ 9, 42.

Although it is Defendants' burden to justify the warrantless seizure, Defendants cite no legal authority in support of their argument. *See e.g. California v. Acevedo*, 500 U.S. 565, 590 n.5 (1991) (quoting *United States v. Jeffers,* 342 U.S. 48, 51 (1951) ("[B]ecause each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those seeking the exemption to show the need for it.'").

The question is whether the present record – in which it is undisputed that the Construction Materials discovered by Defendant Gipson in June 2010, but left for several months within a yard in a residential neighborhood behind a partially-downed fence and across the street from an elementary school – constitutes a condition which qualifies as an emergency exemption justifying a warrantless seizure, thus entitling Defendants to summary judgment.

It does not.  The fact-determinative test for an emergency exception is the contemporaneous presence of actual and immediate serious consequences. *See e.g. Ryburn v. Huff*, 132 S.Ct. 987, 990 (2012) (finding that "the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence"); *see also Sims v. Stanton*, 706 F.3d 954, 961 (9th Cir.) *cert. granted, decision rev'd on other grounds*, 134 S.Ct. 3, (2013) ("The burden to show exigent circumstances rests on the officer, who must "point [ ] to

conducted without a warrant is *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.'").

some real immediate and serious consequences if he postponed action to get a warrant.") (internal

quotation marks and citation omitted) (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 749-50, (1984)).

Defendants posit that Gipson, the City's Code Enforcement Officer, reasonably concluded

that the abatement action on September 24, 2010, could not be postponed to seek a warrant because

immediate action was required to avert imminent serious harm to children at the Property.  Record

evidence does not support this conclusion.  The crux of the emergency exception is that an

immediate action is necessary to avert looming serious consequences.  The requisite urgency is

simply absent here.  It is undisputed that the abatement action did not occur until late September

2010, three months after Gipson's first visit to the Property in early June when she first drew the

conclusion that conditions posed an immediate threat to the public.  Yet, despite her conclusion in

June, two months elapsed before Gipson planned the abatement, and more than three months

elapsed before Defendants entered Plaintiffs' Property and took the Construction Materials away.

There was ample time in the interim to apply for and get a warrant.  It cannot be both reasonable to

wait three months for abatement and unreasonable to wait for a warrant.

There can be no question that delayed abatement to get a warrant could be tolerated,

because delayed abatement was tolerated.  Evidence in the record shows that after the June search,

Gipson acted to instigate the nuisance abatement process, but not immediately.  Instead, she waited

a week to send a notice of abatement to the property owner, in which she granted the owner 15 days

to abate.  In other words, notwithstanding the asserted imminent harm, Gipson did not actually

contemplate serious immediate consequences because, as her letter indicates, she determined that

abatement could wait at least 22 days.  Because the record evidence illustrates that no material

change occurred at the Property between June and September 2010, no basis exists for finding that

the threat of danger was somehow heightened in September 2010, when Defendants finally

performed the abatement.  Gipson's asserted illness, Defendants' justification for the delayed

action, has no effect on whether emergency conditions existed at the Property.  If anything,

Gipson's inactivity between June and August 2010, due to illness or otherwise, emphasizes that the

potential for negative consequences remained abstract.  Defendants swing between asserting that

Gipson observed a child actually playing on the pile of materials at the Property, and conceding that

Gipson's concerns were speculative, as she testified at her deposition.  This fact, ultimately, is not material.  Whatever Gipson's observations in June, they do not prove an emergency in September for purposes of summary judgment.

> On the actual day of the seizure, September 24, 2010, Defendants' entire argument is that:
>
> exigent circumstances existed at the time they entered Plaintiffs' property to abate the public nuisance. Gipson, as the code enforcement officer, concluded that the pile of debris on said property posed an immediate threat or danger to the health of neighboring children.

*Id.*, at 19:17-20.  This is speculation.  Defendants do not assert that the pile was about to fall on them, nor do they describe any other imminent calamity if they failed to act.  Hypothesizing about what could happen sometime in the future is not the same as a real contemporaneous emergency. *See e.g. Allen v. Cnty. of Lake*, No. 14-CV-03934-TEH, 2014 WL 5211432, at *3 (N.D. Cal. Oct. 14, 2014) (in the context of a defendant describing ongoing conditions as an "emergency" for the purpose of an exigency exception, finding that a "mere declaration of an immediate threat does not make it so") (quoting *Sibron v. New York*, 392 U.S. 40, 61 (1968)).   More is required to meet Defendants' burden to prove that circumstances fit the narrow emergency exception to the warrant requirement. *See e.g. Ryburn*, 132 S.Ct. 987; *Welsh,* 466 U.S. 740.  Defendants do not offer, and the Court cannot find, support for the proposition that such speculative concerns rise to the level of an emergency.  And Defendants' characterization of Plaintiffs' Construction Materials as "junk, trash, and debris," is of no mind because there is "no trashy house exception to the warrant requirement." *Olvera v. City of Modesto*, No. 1:11-CV-00540 AWI, 2014 WL 3858362 (E.D. Cal. Aug. 6, 2014) (citing *United States v. Harrison*, 689 F.3d 301, 310-11 (3d Cir. 2012)).

The months-long delay between discovery and abatement is fatal to Defendants' argument.  The Court concludes that circumstances do not fall within one of the well delineated exceptions to the warrant requirement because, on the record evidence before the Court, Defendants do not meet their burden to show real, immediate, and serious consequences if Defendants delayed abatement until they could get a warrant.

Accordingly, summary judgment is inappropriate as to this claim.

*//*

**B.  FOURTEENTH AMENDMENT CLAIM**

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976); *see also MacLean v. Dep't of Homeland Sec.,* 543 F.3d 1145, 1151 (9th Cir. 2008).  *Mathews* "directs us to examine:"

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Brittain v. Hansen,* 451 F.3d 982, 1000 (9th Cir. 2006) (quoting *Mathews,* 424 U.S. at 334-35).  In a court's "balancing" of the *Mathews* factors, "the requirements of due process are 'flexible and call for such procedural protections as the particular situation demands.'" *Vasquez v. Rackauckas*, 734 F.3d 1025, 1044 (9th Cir. 2013) (citing *Wilkinson v. Austin,* 545 U.S. 209, 224-25 (2005)) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972)); *see also Wynar v. Douglas Cnty. School Dist.,* 728 F.3d 1062, 1073 (9th Cir. 2013).

To proceed, "[w]e analyze a procedural due process claim in two steps.  The first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Vasquez*, 734 F.3d at 1042 (quoting *United States v. Juvenile Male,* 670 F.3d 999, 1013 (9th Cir. 2012), *cert. denied,* 133 S.Ct. 234 (2012) (internal quotation marks and alteration omitted)).

Defendants assert that summary judgment on Plaintiffs' due process action is appropriate because, they argue, the Code Enforcement Officer afforded Plaintiffs their procedural due process rights "on several occasions" throughout the abatement process, but that the Plaintiffs failed to exercise those rights.

Plaintiffs contend that in violation of their rights to procedural due process under the Fourteenth Amendment, Defendants failed to provide proper notice or a hearing prior to the deprivation of their property.

22

Because the parties do not dispute that Defendants deprived Plaintiffs of their property interest implicating their constitutional rights, the Court turns to the second prong, whether the procedural processes were constitutionally sufficient.  Due process requires: (1) "notice," and (2) an "opportunity to be heard at a meaningful time and in a meaningful manner." *Schneider,* 28 F.3d at 92 (quoting *Brock v. Roadway Express, Inc.,* 481 U.S. 252, 261 (1987)); *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) ("[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)); *see also Villa-Anguiano v. Holder,* 727 F.3d 873, 881 (9th Cir. 2013).  Here, "a meaningful time" describes predeprivation because the Supreme Court has repeatedly held that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews,* 424 U.S. at 333 (citations omitted).

### 1.  Notice

There is no dispute that the mailed notice was returned to the City, undelivered. SSUMF ¶ 34.  Also, although parties do not agree on the exact date in either June or August, there is no dispute that Gipson posted the "Notice of Violation" related to the nuisance abatement at the property sometime before she deprived Plaintiffs of their personal property. SSUMF  ¶ 44; *see* Doc. 72-11, 12, 15.  Dated June 15, 2010, the posted notice apparently was a copy of the June 15, 2015 CED letter, but posted during the second search in August 2010. *See* Doc. 72-11, 12.  In the letter, Gipson characterized the nuisance at the Property as "junk, trash, debris," gave the property owner 15 days to abate the identified nuisance, and that should they fail to do so, the City was authorized to perform the abatement pursuant to the Taft Municipal Code.

Defendants present no evidence to show that Plaintiffs were likely to see the posted notice. Defendants state that Gipson looked for the property owner or someone at the Property, but it was "apparently vacant."

Plaintiffs argue that Defendants neither provided sufficient notice nor reasonably afforded the opportunity to present their objections before seizing and disposing of their Construction Materials. *See Jones v. Flowers*, 547 U.S. 220 (2006); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

In *Jones v. Flowers*, the Supreme Court made plain that when the government sends notice by mail and the notice "is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before [depriving him of his property], if it is practicable to do so." 547 U.S. at 225; *see also Yi Tu v. Nat'l Transp. Safety Bd.*, 470 F.3d 941 (9th Cir. 2006) (same).  A party need not actually receive notice, rather, "due process requires the government to provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*, at 226 (quoting *Mullane*, 339 U.S. at 314).  Courts have deemed notice constitutionally sufficient when "it was reasonably calculated to reach the intended recipient when sent." *Id.*.  "Accordingly, 'the government [must] consider unique information about an intended recipient regardless of whether a statutory scheme is reasonably calculated to provide notice in the ordinary case." *Yi Tu*, 470 F.3d at 945 (quoting *Jones*, 547 U.S. at 230).

Here, Defendants repeatedly emphasize that the Code Enforcement office knew that Meredith and Darquea lived and received mail at the Bakersfield address, not at the Property in Taft.  Gipson specifically noted during the Second Search that the Property was likely vacant and record evidence indicates that Plaintiffs did not frequent the Property.  A trier of fact could conclude that under these unique circumstances the posted notice left at the Property was not reasonably calculated to reach the intended recipient.  Gipson posted the notice, six weeks passed, but there is no evidence that in that time and before seizing and disposing of Plaintiffs' personal property that she took any additional practical measures to effectuate notice.  Nothing stopped her from sending a non-certified letter for the price of a stamp. *See e.g. Jones*, 547 U.S. at 230 (when a letter is returned by the post office, the sender will ordinarily attempt to resend it, if it is practicable to do so).  Thus, "additional reasonable steps were available to the State." *Id.*, at 225.  Plaintiffs' testimony, supported by the record evidence, is that notice indeed did not reach its intended audience.  On the record before the Court, where Defendants substantiate notice on the basis of a returned piece of unclaimed mail and a posted notice which may not have been reasonably calculated to reach the intended recipient, and no one otherwise made an effort to contact Plaintiffs

1  before depriving them of personal property, the Court is not compelled to conclude that such notice

2  is sufficient without some measure of fact-finding.

3                    **2.  Meaningful Opportunity to Be Heard**

4         Even assuming, *arguendo*, that notice was sufficient, genuine issues of material fact exist

5  about an opportunity for a meaningful hearing.  The posted notice indicated that Plaintiffs "may

6  request an appeal with the City Council" within a specified time. *See* SSUMF ¶ 31; Docs. 72-11,

7  12.  Referencing the possibility of an "appeal" suggests that an initial determination had already

8  been reached by some process, one which did not include the Plaintiffs' participation.  Also implicit

9  in the phrase "may request," is the possibility that the request could be denied. *See Schneider*, 28

10 F.3d at 92 ("for the notice to satisfy due process, it must be of such nature as reasonably to convey

11 the required information").  The instant notice, however, did not necessarily state that Plaintiffs

12 would have an opportunity to be heard before being deprived of their property.

13        Otherwise, Defendants provide no additional information about the predeprivation process

14 available to Plaintiffs, and nor does their posted notice or CED letter.  The notice from the City of

15 Taft Code Enforcement Division reads:

16            … in the case of a "Notice and Order" you may request an appeal with the city
17            council providing this request is made in writing, and is received by this department
           within the allotted time stated on the letter.

18 Doc. 72-12.  This directs a property owner to "the letter" for clarification about timing, but the

19 letter does not actually supply that information.  The letter identifies the nuisance, then states:

20            We understand that prior to this letter you may not have known that the situation
21            constituted a violation of the City Code. However, now that the violation has been
           made known to you, we ask for your cooperation in taking whatever action is
22            necessary to correct the problem. We would hope that within the time specified
23            above [15 days], everything is corrected and that a spirit of cooperation is
           established between yourself and the City.

24            Should you fail to abate the nuisance, the City will abate or cause to abate the
25            nuisance, and the cost of doing so will become your personal obligation and/or will
           be assessed against the property.  Further, the abatement expense can be foreclosed
26            upon or made a tax lien to be collected as a property tax.

27            If you have any questions regarding this matter, please contact my office at
28            [Gipson's direct office number].

*See* Doc. 72-11, 12.  The letter says nothing about an appeal or a hearing process.  The letter neither specifies the allotted time for an appeal, nor does it discuss the appeal process or timing in any way.  *See id.*

In *Vasquez*, the Ninth Circuit held that a county violated Plaintiff's procedural due process rights by enforcing a City's order against plaintiffs without a constitutionally adequate procedure for them to challenge the relevant determination *before* they were subjected to the terms of the order. 734 F.3d at 1045-46.

In the instant case, the Defendants present no evidence that a requested appeal hearing would necessarily occur *before* submitting the Plaintiffs to the nuisance abatement, or if the appeal would be a post-deprivation remedy.  The date of the letter further confuses the issue.  It is unclear if the appeals period would be tied to the date of the letter, June 15, 2010, or the date Defendants assert Gipson posted it during the second search, August 11, 2010.  In any event, as in *Vasquez*, "the precise nature of the process and the potential relief it offers remain unclear." *Id.*, at 1049.  At bottom, the posted notice's statement about the potential for a possible appeal at some unknown future date does not necessarily mean that the process provides a meaningful opportunity for Plaintiffs to be heard.  Defendants do not otherwise assert that any hearing ever occurred prior to finally depriving Plaintiffs of their personal property in September 2010.

The Court finds that where, like here, the government failed to provide a hearing before Plaintiffs were finally deprived of their property interest, factors "weigh clearly in favor" of the conclusion that it violated Plaintiffs' procedural due process rights. *Vasquez*, 734 F.3d at 1044 (finding that the district court "correctly determined that the *Mathews* factors weigh clearly in favor of the conclusion that the City violated Plaintiffs' procedural due process rights by failing to provide any form of hearing before subjecting them to the Order).

### 3.  Postdeprivation Process

Defendants' implicit argument is that "in certain circumstances, a state can cure what would otherwise be an unconstitutional deprivation of 'life, liberty or property' by providing adequate post-deprivation remedies." *Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir. 2001).

26

Record evidence indicates that the City Council held a post-deprivation hearing in March 2011, approximately six months after the Plaintiffs' personal property had been seized and discarded.  Evidence suggests that the topic of the hearing was limited to the City's potential lien on the Property, not the validity of the already concluded abatement process.  Therefore, "[a]ssuming, without deciding, that the deprivation of liberty interests that Plaintiffs have suffered could conceivably have been remedied by some form of postdeprivation procedure, we conclude that [Defendants have] provided no such adequate process. *Vasquez*, 734 F.3d 1025, 1048.  As the Ninth Circuit did in *Vasquez* "[w]e proceed in this fashion because the parties have not briefed whether the deprivations of liberty at issue here fall into the limited circumstances in which [p]ost-deprivation procedures may provide adequate due process." *Id.*, at 1048 n. 22 (citing *Albright v. Oliver,* 510 U.S. 266, 315 n. 37 (1994) (Stevens, J., dissenting); *Zinermon v. Burch,* 494 U.S. 113, 132 (1990) (noting that "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . post-deprivation remedies may satisfy due process"); *Bailey v. Pataki,* 708 F.3d 391, 405 (2d Cir. 2013) (quoting *Zinermon,* 494 U.S. at 132) ("[W]here the State feasibly can provide a predeprivation hearing . . . it generally must do so regardless of the adequacy of a post-deprivation . . . remedy."); *Zimmerman v. City of Oakland,* 255 F.3d at 738 (holding post-deprivation remedies inadequate where a state officer "acted pursuant to some established procedure," as opposed to in "random, unpredictable, and unauthorized ways")).

At this stage, the Court is not persuaded that the mailed but undelivered first notice, or the posted notice about the potential for a possible future appeal, or the post-deprivation lien hearing, respectively or collectively, satisfy the due process requirement for notice and a meaningful opportunity to be heard. *See Mathews,* 424 U.S. at 333.  Based on the record before the Court, genuine issues of material fact exist whether the Code Enforcement Officer provided a meaningful opportunity for Plaintiffs to be heard before subjecting them to deprivation of their property interests.

Therefore, summary adjudication of the due process action is inappropriate.

//

//

### III.     CONCLUSION AND ORDER

The Court has determined, *supra*, that Defendants' search at Plaintiffs' Property comports with the Fourth Amendment and, as no genuine issues of material fact persist for a trier of fact, summary judgment is warranted as to Plaintiffs' first cause of action.  As to Plaintiffs' Section 1983 claim for an unlawfully warrantless seizure under the Fourth Amendment, however, summary judgment is inappropriate because based on the record evidence, an exception to the warrant requirement does not apply.  Finally, there are genuine issues of material fact whether Defendant Gipson violated Plaintiffs' procedural due process rights under the Fourteenth Amendment, therefore, summary judgment is also inappropriate on Plaintiffs' procedural due process claim. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 72) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    a) the motion is **GRANTED** as to Plaintiffs' first cause of action under Section 1983 related to Defendants' warrantless but reasonable search at the Property; and,

    b) because material disputes of fact persist for trial, the motion is **DENIED** as to Plaintiffs' second Section 1983 claim alleging warrantless seizure in violation of the Fourth Amendment; and,

    c) because genuine issues of material fact also persist whether Defendant Gipson violated Plaintiffs' procedural due process rights under the Fourteenth Amendment, the motion is likewise **DENIED** as to this claim.

IT IS SO ORDERED.

Dated:   __**May 28, 2015**__                             _____/s/ Lawrence J. O'Neill_
                                               UNITED STATES DISTRICT JUDGE